(7 App. Div. 95)

OLNEY v. BAIRD et al.

(Supreme Court, Appellate Division, First Department.    June 29, 1896.)

CORPORATIONS—INSOLVENCY—PREFERENCE OF OFFICER.

A director who had made advances to a corporation obtained a bill of sale of all its property from the president. About the same time he transferred his stock to some of his employés, one of whom took his place as officer of the corporation, but he continued to direct its affairs as he had done theretofore; and the evidence of one of the transferees showed that the transfer of the stock was not absolute, and that nothing was paid therefor. *Held*, that the bill of sale was void, under Laws 1890, c. 564, § 48, forbidding an insolvent corporation to transfer any of its stock to any officer thereof with intent to give a preference. 37 N. Y. Supp. 815, affirmed.

Appeal from special term, New York county.

Action by Peter B. Olney, as receiver of the Sargent Granite Company, against Matthew Baird and William P. Baird, to set aside certain instruments in the form of a bill of sale executed by the officers of the granite company to defendant Matthew Baird, from April, 1892, to August, 1892, also to set aside a lease to him of what is called the "Mount Hagen Quarry," and a judgment obtained by the said Matthew Baird in Maine against the granite company in January, 1893.    From an interlocutory judgment in favor of plaintiff (37 N. Y. Supp. 815), defendants appeal.    Affirmed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Joseph Fettretch, for appellants.

G. C. Comstock, for respondent.

VAN BRUNT, P. J.    This action was brought by the plaintiff, as receiver of the Sargent Granite Company, to vacate and set aside certain transfers of personal property made by the Sargent Granite Company to the defendant Matthew Baird during the year 1892, upon the ground that said company was insolvent at the time of making such transfers, and that the same were made in contemplation of insolvency; and also to set aside a certain lease made to him of property which had previously been leased to the Sargent Granite Company, and to have declared fraudulent and void a judgment obtained by the defendant Matthew Baird in the state of Maine against the said company, and the execution and sale thereunder. We might very well dispose of this appeal upon the very satisfactory opinion rendered by the learned judge at special term, were it not for the circumstance that the learned counsel for the appellant insists so strenuously that the evidence contained in this record was misconceived by the court below, and that a mistaken view as to its probative force was the reason why the court reached the conclusion which it did.    It seems to us, however, that a very brief statement of the facts as they appear upon the record will show that no other conclusion could have been arrived at, and that the transfers in question were made to the defendant when he knew that the company was insolvent, and that it was in contemplation of the stoppage of its business that they were made, and that dur-

ing all the time he was in reality a stockholder of the corpora-
tion, although he had nominally transferred his stock for the pur-
pose of freeing himself from the disabilities attending that posi-
tion. It appears that the Sargent Granite Company was a corpo-
ration organized as a mining corporation under the laws of the state
of New York on the 7th of April, 1889. The capital of the corpo-
ration was fixed at $20,000, represented by 200 shares, all of which
except 5 were issued for property which was transferred to it.
Prior to the 28th of May, 1890, Mr. Schramme, who was one of the
stockholders and directors of the company, had advanced consid-
erable sums of money, and upon which day the company gave to
Schramme a bill of sale of all its property, consisting of stock in
trade, tools and machinery, as security. In the latter part of Au-
gust, 1890, Schramme, his advances being about $10,000, became
dissatisfied, and asked Mr. Frank T. Sargent, the president of the
company, to get some one to buy him out, and take his place. Sar-
gent thereupon called upon Mr. Matthew Baird, and told him that
Schramme was willing to transfer his bill of sale and give all the
stock he had in the company—which at this time amounted to 100
shares—to Baird, if he would take Schramme's place. Sargent and
Baird had some further conversation in regard to Baird furnishing
money to the company for the purpose of doing its business, and
it was agreed that the company should ship all its products to
Baird, and that he should collect the accounts, and apply the pro-
ceeds to the payment of any money that he had advanced to the
company. Mr. Baird testified that it was further a part of the
agreement that he was to receive from time to time from the com-
pany security in the form of bills of sale for the moneys which he
might advance. This portion of the agreement is denied by Sar-
gent. The court below, upon considering all the evidence, came
to the conclusion that, although Sargent's testimony was not to be
accepted in all other respects, he had given the true version of the
arrangements between Baird and himself upon the occasion men-
tioned. It is urged upon the part of the appellants, however, that
the learned court was mistaken, and that Baird's version of the
transaction was confirmed by the witness Schramme and by the
probabilities of the case. It is contended that, because Schramme
testified, "Thereupon Mr. Sargent came to me, and told me that
he had made an arrangement with Mr. Baird to take my place," he
corroborates Baird in regard to the transaction. We are unable
to agree with the learned counsel for the appellants upon this prop-
osition. There is nothing in the testimony of Schramme, so far
as we have been able to ascertain by a reading thereof and a care-
ful examination of the points of the appellants, to indicate that
there was any arrangement by which Schramme was to receive from
the company, from time to time, security in the form of bills of sale
for the moneys which he might advance. It is claimed upon the
part of the appellants that the evidence may be so construed as to
hold that Schramme received his bill of sale before he made the ad-
vances which were repaid by Baird at the time of the substitution
of the latter for him; and this construction undoubtedly may be

put upon the evidence, but it in no way corroborates the appellants' claim that there was any continuing agreement that bills of sale were to be executed from time to time for moneys which might be advanced by Schramme, and there is no proof that any agreement of the description claimed by the appellants ever existed in favor of Schramme. At the time of the negotiation with Baird the company was indebted to Schramme in something less than $10,000, the amount of the bill of sale. If we concede that the agreement between Baird and Sargent was of the character testified to by Baird, it is difficult to see how such an agreement could be binding upon the company. Mr. Sargent, the president, had no authority, by virtue of his office, to make an agreement by which at any moment the company could be stripped of all its property, and prevented from conducting the business for which it was organized. And even if such an agreement could have been made by the trustees of the corporation, there is no evidence that Mr. Sargent was authorized to make any such contract. But it may be said that the corporation, by its duly-constituted officers, subsequently executed bills of sale of the character claimed by Mr. Baird; and that this was a ratification of the authority of the president to make such an arrangement, if it had been made. We fail to see that any such effect can be given to the action of the board of trustees authorizing bills of sale made long after this alleged arrangement with Mr. Baird. Those were transactions by themselves, and there is no evidence that they had any relation to any undertaking or agreement between Sargent and Baird, and no evidence that the trustees of the corporation, other than Sargent and Baird, had any knowledge of the existence of such an arrangement, even if it was made; and one of the principles of ratification is that the party ratifying must have knowledge of all the material facts. Therefore, upon a consideration of all the evidence, in view of the fact, as urged by the court below, that no transfers by the company to Baird were made for advances for a long period of time after this arrangement, and no demand was made by Baird for such transfers based upon any previous agreement, it is evident that no such agreement was made, and the appellants cannot claim any rights founded upon its existence.

Without going into details, it appears that subsequent to the arrangement with Baird he virtually transacted the business of the company, received all the output of the company, sold it, received the money, and advanced moneys for the carrying on of the work. It does not seem to have been a particularly successful adventure, since the indebtedness of the company to Baird kept increasing and increasing, until in March or April, 1892, the company owed him something over $100,000, besides an amount of other indebtedness for merchandise used at the quarries, the wages of the men there employed, and the rent of leases unpaid. At this time Mr. Baird concluded that his situation as a creditor of the company was not an absolutely safe one, and he demanded from Sargent a bill of sale of all the property of the company, and on the 19th of April, 1892, a bill of sale was executed by the president and secretary

of the company of all its property, and delivered to Mr. Baird. There is no evidence that the president and secretary were authorized by the stockholders to execute this bill of sale, or that they in any manner assented to its execution. It is claimed, however, that subsequently the stockholders, at a meeting at which all were not present, ratified its execution. Whether such ratification amounted to anything or not, it is not necessary to discuss or determine. It appears from the evidence that about this time Baird came to the conclusion that his position as stockholder and treasurer and secretary and assignee by virtue of the bill of sale of all the property of this company as security for alleged indebtedness was somewhat inconsistent, and he resigned as director, secretary, and treasurer, and transferred his stock to certain of his employés. One of said employés, named Clark, was elected secretary and treasurer in Mr. Baird's place; and another, named Harrington, was elected director in his place. It is claimed upon the part of the appellants that thus the confidential relations existing between himself and the company were severed, and that the inhibitions of the statute no longer applied to him. The business of the company, however, was conducted in the same manner as before. Baird directed all its affairs, and assumed the same control as he had previously exercised, and the evidence of Harrington shows beyond dispute that the transfer of the stock was not absolute, but that it was understood by the transferees that they were acting for Baird, and in his interest, and that they were not the absolute owners of the stock, and had paid nothing therefor. He says that Baird told him that anything that would come from the stock after he (Baird) was paid would be his, and that, if any profit or income came from it, it would be his to get the profit on it. In other words, Harrington was to have anything that was left after Baird was paid, but he was to have no right to receive anything until that event occurred. It is manifest from the manner in which and the persons to whom these transfers were made, the fact that they took the place in the board previously occupied by Baird, the fact that the latter still managed the company notwithstanding the alleged change of relationship, and the clear intimation by Harrington that he was to have no interest in the stock until the indebtedness to Baird was paid, that Baird transferred this stock, not in good faith, but for the purpose of removing the supposed disability. We do not think that such a transfer (not being made in good faith, and Baird not parting with the absolute ownership of the stock) could relieve him from the disability which attached to the position of a stockholder of this company.

It further appears that other bills of sale were executed, and that when Baird thought it necessary for the protection of his interests to bring an action in the state of Maine against this corporation, at his expense and request the secretary and treasurer of the company went to the state of Maine in order that they might be served with process in that action,—another indication that these persons were put into the corporation by Baird, and were his representatives and tools. It cannot be that by such an arrange-

ment the disability imposed by statute upon stockholders and officers of corporations can be avoided.

That at the time of receiving these bills of sale and the commencement of this action Mr. Baird was aware of the insolvency of this company is amply established by the evidence, although he claims he was unaware of the existence of any debts except his own. It appears that he knew that the company was in debt for rent of its quarries, and that it had no money with which to pay such rent; and he also knew that it was indebted for merchandise used at the quarries, and also for wages, and that the company was desirous of getting machinery, and had no money with which to get it, except such as they should get from him. And he knew further that he was taking from this company, by absolute bills of sale, every bit of property which it owned, and that at any moment the business of the company could be stopped by him. It is clear that he must have known that the company was absolutely insolvent, and that it had no hope of continuing its business, except from moneys which might be advanced by him. It may be that, prior to the time of taking the security for his indebtedness, which commenced in April, 1892, he may have hoped that the business of the company would be prosperous, which led him to advance large sums of money, until they amounted to about $100,000. But it then appears that he became alarmed at the condition of the company, and began to seize everything in sight. He then knew, as already stated, that the company was in arrears for rent of the property necessary for the conduct of its business, and that it had not the requisite tools and machinery to carry on its business, and, knowing these facts, and therefore knowing that the corporation could not continue its business, he proceeds to become the owner of the lease of the only quarry of the company which it was thought might be successfully worked. With all these facts and circumstances before us, it seems impossible to come to any other conclusion upon the questions of fact than that reached by the court below.

The judgment should be affirmed, with costs. All concur.