### McGILL v. COMMERCIAL CREDIT CO.

(District Court, D. Maryland. June 17, 1917.)

1. BANKRUPTCY ⟨⟩303(3)—PREFERENCES—EVIDENCE—SUFFICIENCY.

In a suit by a trustee in bankruptcy to recover a sum of money paid by the bankrupt to defendant, evidence *held* insufficient to show that defendant and the bankrupt conspired to defraud other creditors of the bankrupt.

2. BANKRUPTCY ⟨⟩166(1)—PREFERENCES—KNOWLEDGE OF PARTIES.

In determining whether defendant, which received an assignment of accounts due a bankrupt, had knowledge that such assignment would effect

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

a preference, the standard of conduct is an external standard, and takes no account of the personal equation of witnesses produced as experts.

3. BANKRUPTCY ☞303(3)—PREFERENCES—EVIDENCE—SUFFICIENCY.

In a suit by a trustee to recover from defendant on account of a transfer by the bankrupt which was preferential in fact, evidence *held* to show that defendant's officers had reasonable cause to believe that a preference would result from the assignment demanded and received from the bankrupt.

4. BANKRUPTCY ☞160—INSOLVENCY—TEST.

Unlike the common law, one is not insolvent under the Bankruptcy Act when the fair value of his possessions exceeds the amount of his debts, though he may not be able to discharge them when due in lawful money.

5. BANKRUPTCY ☞303(3)—PREFERENCES—INSOLVENCY.

In a suit by a trustee to set aside an alleged preferential transfer by the bankrupt, evidence *held* to establish the bankrupt's insolvency at the date of the transfer.

6. BANKRUPTCY ☞303(1)—INSOLVENCY—BURDEN OF PROOF.

A trustee in bankruptcy, suing to set aside an alleged preferential transfer by the bankrupt, has the burden of establishing the bankrupt's insolvency at the date of the transfer.

7. BANKRUPTCY ☞303(1)—ACTION—INSOLVENCY—PRESUMPTION.

Extreme insolvency, in the bankruptcy sense of the word "insolvency," at the time of the filing the petition in bankruptcy, raises a rebuttable presumption of insolvency during the preceding four months, sufficient, in the absence of any evidence that the bankrupt situation during these months changed for the worse, to sustain the burden resting on the trustee to show insolvency at the time of the making of the transfer alleged to be preferential.

8. BANKRUPTCY ☞159—PREFERENCES—WHAT CONSTITUTE.

Where a bankrupt who was insolvent assigned accounts receivable to defendant, who was charged with knowledge that it was receiving a preference, such transfer, as it in fact preferred defendant and was made within four months of bankruptcy, is subject to attack as a preference.

9. BANKRUPTCY ☞185—TRANSFERS SUBJECT TO ATTACK—STATE STATUTE.

In view of Bankruptcy Act July 1, 1898, c. 541, § 70e, 30 Stat. 565 (Comp. St. 1916, § 9654), declaring that the trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, the trustee in bankruptcy of a New York corporation may recover property transferred by the corporation where the transfer was subject to attack under New York Stock Corporation Law (Consol. Laws, c. 59) § 66, declaring that no conveyance, assignment, or transfer of any property of a corporation which has refused to pay any of its notes or other obligations when due, or any payment made, judgment suffered, lien created, or security given by it when insolvent, or its insolvency is imminent, with intent to give a preference, shall be valid; for the broad language of the section in the Bankruptcy Act shows that the trustee in his attack on preferences was not restricted to those declared to be invalid by the act itself.

10. CORPORATIONS ☞537—TRANSFERS—"INSOLVENCY."

Under the New York statute, "insolvency" is a general inability to answer in the due course of business the liabilities existing and capable of being enforced.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Insolvency.]

11. CORPORATIONS ☞544(5)—INSOLVENCY—PREFERENCES—VALIDITY.

A transfer by an insolvent New York corporation, which effected a preference, cannot be sustained under the New York statute, though the cred-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

itor receiving the preference had no knowledge or notice of the corporation's insolvency.

12. CORPORATIONS ☞544(6)—INSOLVENCY—PREFERENCES—VALIDITY.

Under New York Stock Corporation Law, § 66, declaring invalid transfers by an insolvent corporation intended to effect a preference, the assignment of accounts to defendant cannot be sustained on the ground that defendant became a creditor of the corporation only through the fraud of the insolvent corporation's officers.

13. BANKRUPTCY ☞303(3)—CORPORATIONS—PREFERENCES—EVIDENCE—SUFFICIENCY.

Where a conveyance by a New York corporation was attacked on the ground that it effected a preference, evidence *held* to show that it was the intention of the corporate officers to effect a preference.

14. CONSTITUTIONAL LAW ☞162—CORPORATIONS ☞540—DUE PROCESS OF LAW—INSOLVENCY LAWS.

Though no state may impair the obligation of a contract, New York Stock Corporation Law, § 66, declaring preferential transfers by insolvent corporations to be invalid, is not open to attack in its application to a nonresident creditor, debts furnishing the basis for the transfer not being questioned.

15. CORPORATIONS ☞540—TRANSFERS—WHAT LAW GOVERNS.

A New York corporation, which subsequently became a bankrupt, sold accounts receivable to defendant, a foreign corporation having its office in Maryland. The contract required the New York company to tender such accounts at defendant's Maryland office, from whence the purchase price was transmitted to the New York company. Officers of the New York company converted moneys received on some of the accounts sold, and at a meeting of the officers of the defendant and the New York company, had at its home office, it was agreed by such company to assign to defendant a sufficient number of accounts to make good the money converted. At that time the New York company was insolvent. *Held*, that the assignment, which was subject to attack under Stock Corporation Law, § 66, took place in New York, the New York company there making the agreement, though the accounts were transmitted to defendant at Maryland, and hence the assignment could not be sustained on the ground that the section was applicable only by giving it an extraterritorial effect.

16. CORPORATIONS ☞542(1)—INSOLVENCY—PREFERENCES—CONTRACTS.

In such case, the fact that the contract between defendant and the New York company, after providing for the retention of a large percentage of the purchase price of the accounts in defendant's hands until the assigned accounts were paid, declared that no payments of any such remainder should be made so long as any accounts purchased were affected by any breach or violation of any warranty, but such remainder might be held and applied to the payment of any such accounts, cannot take the transfer, which was preferential, out of the province of the statute, on the theory that, when defendant once got the accounts into its hands, it was entitled to reimburse itself for moneys previously converted by the New York company.

17. BANKRUPTCY ☞163—FRAUD OF BANKRUPT—TRUSTS.

Where a bankrupt, which assigned accounts to defendant, converted payments received on such accounts, but defendant could not trace such conversions into other unassigned accounts, it cannot, on the theory of the trust, sustain a subsequent assignment of other accounts which worked a preference.

Bill by Charles H. McGill, as trustee of William H. Rich & Son, against the Commercial Credit Company. Decree for plaintiff.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Rosenberg, Levis & Ball, of New York City, Sykes & Nyburg, of Baltimore, Md., and Robert P. Levis, of New York City, for plaintiff.

Leo Oppenheimer, of New York City, and Sylvan Hayes Lauchheimer, of Baltimore, Md., for defendant.

ROSE, District Judge. William H. Rich & Son, Inc., is, or was, a New York corporation. In the borough of Brooklyn, in the county of Kings, in that state, it was for some years extensively engaged in making and selling umbrellas and similar articles. Upon its own petition filed on the 15th of May, 1915, it was adjudicated a bankrupt by the United States District Court for the Eastern District of New York. It will be called the bankrupt. In due course the plaintiff, Charles H. McGill became its trustee, and will be so styled. The defendant is the Commercial Credit Company. It has a Delaware charter, but its business is carried on in or from Baltimore, in which, or in the suburbs of which, all its principal officers reside. It has waived objection to being sued here.

On the 17th of February, 1915, it was an unsecured creditor of the bankrupt for upwards of $55,000. To pay or secure this sum the bankrupt, between the date named and the 5th of the succeeding April, assigned to the defendant outstanding accounts due it by various customers, to the aggregate amount of something over $71,000. From these the defendant has paid itself in full. The trustee seeks to recover what the defendant thus received. He rests his case upon three distinct grounds. They will be stated here, not in the order in which they appear in his bill of complaint, but in that in which it will be most convenient to discuss them. They are:

First. The bankrupt and the defendant conspired to defraud the other creditors of the former.

Second. The assignment was a preference voidable under the Bankrupt Act.

Third. It was a preference voidable under the Corporation Law of New York.

Of these in their order:

### The Alleged Conspiracy to Defraud.

[1] Defendant furnishes, at a price, cash to merchants and manufacturers upon the security of the accounts due them for their wares. This business has in late years reached large proportions. It flourishes because it enables the seller of goods, so soon as he has shipped them, to turn into money a larger percentage of their price than it would be ordinarily possible for him otherwise so promptly to do. Under the trade usage of some countries, buyers of goods, upon receipt of bill of lading, accept drafts for the price, payable at an agreed time after sight. Where this is done, there is no demand for the special form of banking in which the defendant is engaged. The seller simply discounts his draft at a bank. The latter does not have to take expensive precautions to prevent the seller from collecting it when due or from applying the proceeds to his own use. It therefore can afford to discount such paper at its usual rate. Where the

maximum legal rate of interest is 6 per cent. the cost to the bank's customers for such an accommodation will not reach 8 per cent., even taking into consideration the balance which under such circumstances a bank would expect its customers to maintain. Such discounting of commercial bills impairs no one's credit. He who does it is not anxious to conceal the fact. It so happens in this country that in most lines of business it is unusual for buyers to accept drafts, and it is rather uncommon for those who are prompt pay to give notes for their purchases. But here, as elsewhere, men always want to make and sell all the goods for which they can find a profitable market, and sometimes, in order to tide over what they persuade themselves are fleeting embarrassments, they are willing to make large sales at or even below cost. They need the use of more money than they have or can borrow upon their personal credit alone. They seek to use as security the sums due them by their customers. In America these are ordinarily in the form of open accounts and in that form alone. Such an account is by no means as good a security as a customer's note or bill, and it necessarily costs more to discount. All defenses available as against the seller of goods may be made against it in whomsoever's hands it may come, whether they be breach of warranty, failure in quantity or quality, set-off, or what not. Such drawbacks to the availability of open accounts are inherent. There are others which are imposed by the present point of view of many bank and credit men, who question the wisdom of doing business with those who sell their accounts. They say that one who does so has freed himself from one of the most effective checks upon overtrading; that such sales make it exceedingly difficult, if not impossible, for any one dealing with him to be sure what unpledged assets, if any, he has; and that he is handicapping himself by paying more than the ordinary bank rate for money. Most men who sell their accounts are anxious to keep the fact secret. That cannot be done if notification of the sale be given to the customer whose account has been sold. Yet the withholding of such notice still further reduces the security value of the account, and compels the purchaser to take various expensive and troublesome precautions, for which in the long run the seller must pay. The debtors of the seller make their payments to him. The buyer keeps a staff of auditors, clerks, and perhaps other agents, busy in trying to make sure that he gets all the money which the seller receives from a sold account. In spite of all this watchfulness, he not infrequently fails to do so. In this as in other forms of collateral banking, there is a tendency to look more to the security than to either the moral or financial worth of the borrower. It was Bagehot, I believe, who years ago acutely observed that, in the long run, lending on the commercial credit of the maker of negotiable paper was safer than lending on collateral of any kind.

The poorer or the more troublesome the security, the more the borrower must pay for the loan. One of defendant's witnesses said that the money received by the seller of accounts cost him on an average from 15 to 16 per cent. That fact makes the seller all the more unwilling that any one should suspect that he sells his accounts. De-

fendant seeks, as it must, to meet the seller's wishes. In many cases it thinks it necessary to insist that the very checks with which the seller's customers pay his account should be turned over to it. If it passes such checks through its own bank in the ordinary way, its indorsement may tell the story to the drawer of the check. To prevent such a possibility, the defendant, in pursuance of a formal resolution of its board of directors, agrees with its banks that the number "54" stamped on the back of checks shall constitute its indorsement. The checks of the bankrupt's customers which came to defendant were so indorsed. It wanted to supervise the bankrupt's dealings with its customers without giving any of them reason to suspect that there was any relation between it and the bankrupt. For that purpose the bankrupt was required to rent a post office box in its own name, but to turn the key over to defendant's agents. The latter, calling themselves for the purpose the Eastern Audit Company, requested statements from some of the bankrupt's customers.

In the absence of statute to the contrary, the purchaser of accounts is not required to notify the debtor. If he does not, he takes the risk that the latter may pay the seller, but as against third persons he acquires good title to the account. Such a buyer is therefore under no legal obligation to tell any one he has bought an account, and, unless the circumstances are peculiar, it is not easy to argue that he is under any ethical call to do so. But defendant was not content with merely keeping its business to itself. It went further in this, and, as it says, in many other cases. For the sole purpose of preventing some people from suspecting the truth, it did what it otherwise would not have done, and it continued to do these things after it knew the bankrupt's creditors, or some of them, had become exercised over a report that the bankrupt was selling accounts, and after it had reason at least to suspect that the bankrupt was not making truthful answers to the questions which on this subject its creditors were putting to it.

It was on September 4, 1912, that the defendant began the purchase of the bankrupt's accounts, and within the next two years it bought them to the aggregate amount of over a million dollars. In March, 1914, some rumors that the bankrupt was selling its accounts reached some of its creditors, and they spoke to its president on the subject. He was much exercised, and on the 21st of that month wrote Mr. Duncan then president of defendant:

"It was reported to me yesterday that a house in New York makes the assertion that we sell our accounts receivable. * * * I thought it advisable to write you personally to have you investigate the possibility of a leak on the part of any of your staff. In this office we naturally do all we can to keep this private, and I believe that we succeed. * * * I shall be glad to have you consider this strictly confidential, and give me your views regarding the matter as early as possible."

Mr. Duncan answered that he was surprised, and added:

"We do everything possible to keep the names of all of our customers strictly confidential. * * * We would do all but fire any clerk that gave out such confidential information about any of our customers. I regret very much indeed that any one should have heard of this matter, although it may

be an assumption, and if there is anything further that I can do please let me know."

On March 24th the bankrupt wrote:

"One of our large creditors, who feels very friendly toward us, telephoned me that this same rumor had reached him. * * * Will you kindly send to me by return mail sketch of just how you indorse checks that we send to you from our customers, also the indorsement you use when we send you our check."

Mr. Duncan replied:

"I can't imagine how any concern could have learned that you were selling some of your accounts. Your customers' checks are not indorsed by us at all, as the indorsement stamp furnished to you is all that appears on same, the number '54' being accepted by all of our banks instead of our name. Your checks are indorsed, 'Pay to the order of Philadelphia National Bank, William H. Grimes, Treasurer.' Of course, the name of the bank changes according to where the check is deposited, but our name never appears on any checks. We suggest that your checks be made to your own order, and our regular indorsement stamp that you have be put on same, instead of being made payable to Mr. Grimes, Treasurer. * * *

"By the way, inasmuch as one of your large creditors who is friendly toward you talked to you about the matter, won't you kindly tell me frankly the result of his talk?"

There is no evidence that the question with which Mr. Duncan closed the above passage above quoted was ever answered, but it is testified that in that same month of March, 1914, the bankrupt's president told a creditor that the rumor that it was selling its accounts was a "damn lie."

The form of indorsement first used by the bankrupt was, "Pay to the order of ——— Bank, William H. Grimes, Treasurer." Subsequent to this correspondence it became, "Pay to the order of any bank or banker, William H. Rich & Sons, '54' Brooklyn." The number "54," it will be recollected, was that by which defendant was known to its bank.

On April 11th in the same year—that is to say, a few weeks subsequent to the correspondence above quoted—Frederick Vietor & Achelis, to whom the bankrupt was then indebted, as it was at the time of its adjudication, wrote that they heard it was having its accounts advanced upon without notice to its customers. They asked to be fully advised on that question. The bankrupt at once replied through its president, who apparently conducted all its correspondence:

"We believe that after pleasant business relations of more than a quarter of a century, you will accept our assurances that there is absolutely no truth in the suggestion."

On the same day the bankrupt sent the letter of Frederick Vietor & Achelis, or a copy of it, to Mr. Duncan. Apparently it did not tell him what answer it made, but it did say:

"I do not know what your experience has been with these sort of houses, but around here they seem to attach considerable unfavorable importance to the subject at issue. Kindly send inclosed letter back to me by return mail, and let me have your assurance that this is strictly confidential between you and myself. By this I mean I think it advisable for you not to bring it up with any of your people. Under the circumstances, I will ask you to accept

my personal check in payment of accounts that have been paid to us by checks drawn on New York banks. For a few days it seems to me this would be the safest way to handle the business between us. Meanwhile, of course, any checks belonging to you drawn by our customers on out of town banks we will continue to send to you."

On the 16th of April, Mr. Duncan answered. In the letter he assured the bankrupt that as long as it continued to pay its bills it would have no trouble in getting all the goods it wanted to buy, and attributed the trouble the bankrupt was having to competitive sources, and stated that the firm who wrote to the bankrupt did millions of business like the defendant's except that the customers were notified, and then continued:

"I suppose you mean you want to send your personal check for accounts drawn on New York banks by customers located in New York, which will be satisfactory to us. Out of town customers, whose checks are on New York banks other than those with which you deal, will reveal nothing if sent to us. Your frequent checks to us on your bank will quicker arouse its curiosity than the present method in force. Our suggestion is that you send your check only for your New York customers' accounts, or for all customers whose checks are on your banks, at the same time sending, as heretofore, the customers' original checks so they can be checked up according to our usual system and they will be returned to you the same day as received without fail. * * * This matter will be treated in the strictest confidence between Mr. Grimes, you, and myself, and I assure you again that I can't imagine how the information got out."

Months later defendant arranged with the bankrupt ways in which it could supervise the bankrupt's accounts without anybody other than themselves being the wiser. Indeed, the post office box, before referred to, was not rented until some time in the succeeding October.

The plaintiff contends that from such of the above facts, which were admittedly known to Mr. Duncan, he, as a reasonable man, must have felt sure that the bankrupt would make false answers to its creditors' inquiries, and when the defendant thereafter actively aided it to keep secret the fact that the latter was selling its accounts, defendant made itself a party to the bankrupt's obtaining credit by false representation. It is to be regretted that a corporation of the financial responsibility of defendant, and whose president and other officers are men of high standing and of unquestioned integrity, have drifted into such a position that the charge made by the plaintiff cannot be set aside as mere reckless abuse. For at least 2,000 years the ease of descent to unpleasant depths has been proverbial. Defendant knew it had a legal and moral right to say nothing about what it was doing. It had good business reasons for wishing that no one should know it was buying the bankrupt's accounts. It assumed, perhaps without much reflection, that it had a right to do something more than merely keep its mouth shut. It did things for no other purpose than to prevent anybody suspecting that it was dealing in bankrupt's accounts.

Defendant continued to make use of its ingenious devices for concealment after it knew, or at all events must have strongly suspected, that by so doing it was aiding the bankrupt to make some of the latter's other creditors believe that it was not selling accounts. One may keep his own counsel, but it is doubtful whether any one is ever justi-

fied in doing anything for the purpose of concealing the truth from one who has a legitimate interest to discover it. At all events, one who begins to do so must be always on the watch if he would stop at a point beyond which it is clear no one should go. Large corporations, with many employés, run some exceptional risks when they sanction such practices. Nevertheless, regrettable as were some of the things which defendant did, no one of them, nor all of them combined, sustain the claim set up by the trustee. As his charges have been spread upon the records of the court, and as they have not been sustained in fact, it has seemed best to say so; but by so doing it is not intended to intimate that, even if the evidence had been other than it is, the trustee would have had a right of action. It may well be that the only persons who could sue therefor would be the individual creditors who had been deceived to their hurt.

### The Alleged Bankrupt Preference.

[2, 3] Was there a preference voidable under the Bankrupt Act? The transfer of assets operated as a preference in fact. The other unsecured creditors of the bankrupt will receive not more than 12 per cent. of their claims. Mr. Duncan acted for the defendant in securing this assignment. When he did so, did he have reasonable cause to believe that a preference would result? He says he then thought the bankrupt was solvent, yet he knew that defendant's auditor had made monthly examinations of the bankrupt's books, that attempts to verify its accounts had been made through the use of the post office box already mentioned, that bankrupt had successfully evaded all these precautions by keeping a false set of books, and had thereby fraudulently appropriated to its own use a sum then known to reach at least $25,000, and which subsequent investigation proved amounted to $55,-000. He knew that the bankrupt's president, when he caused this to be done, was well aware that defendant on its letter-heads carried this standing warning: *"We Prosecute Every Case of Loss Through Dishonesty."*

Nevertheless, he claims that he believed bankrupt's statement of its condition on the last day of the year 1914 to have been true, or substantially true, and by that the value of the bankrupt's assets exceeded all it owed its creditors by the sum of $328,000. He explains that he thought the statement was true, although he knew the books were false, because the former bore the indorsement of some one who signed himself "Certified Accountant." Who this accountant was, or what was his standing, if any, in his profession or in the community, Mr. Duncan did not know or apparently try to find out. Defendant put on the stand a number of persons connected with concerns in the same line of business as it, and some experienced bankers. It offered to prove by them that the facts known to Mr. Duncan, when he demanded and received the assignment of accounts, would not constitute reasonable cause to believe that the bankrupt was insolvent. Upon objection, this testimony was excluded.

In another class of cases the Supreme Court laid down a rule believed to be here applicable:

"The standard of conduct, whether left to the jury or laid down by the court, is an external standard, and takes no account of the personal equation of the man concerned." It is not "coextensive with the judgment of each individual." The Germanic, 196 U. S. 589, 25 Sup. Ct. 317, 49 L. Ed. 610.

The president of the bankrupt had, for an indefinite number of years, carried on a large business. He seems to have had good credit. There is no suggestion that he had not a respectable standing in the community. For the sake of dishonestly getting $25,000 for a corporation practically all of whose stock was owned by him or his son, he induced his bookkeeper to forge accounts. I am not prepared to hold that such facts, when known to one whose money has been thus taken, do not constitute reasonable ground to believe that the corporation is insolvent. Defendant says that, in spite of its warning as to prosecution, many business men, without giving much thought to the matter, do apply to their own use proceeds of accounts which they have already sold. That can well be, but it has nothing to do with the case at bar. One who devises an elaborate system of false bookkeeping to conceal such diversion has thought much about it. It may be that sometimes the business for which such criminal things have been done may nevertheless be solvent, but one who knows that they have been done, before dealing with him who did them, will ask for better proof of solvency than a statement furnished by the very man who caused the books to be falsified.

Moreover, Mr. Duncan then knew that many of the bills then owing by the bankrupt to its merchandise creditors were overdue. He was demanding the assignment of the only assets from which, within any reasonable time, the bankrupt could meet those already too long postponed obligations. He could not have failed to anticipate what would be the probable, if not certain, result. Defendant points to the fact that after the completion of the transfers of the accounts now in controversy—that is, subsequent to April 5th—it bought other acccounts and paid for them in cash, as evidence that it did not believe the bankrupt insolvent. The assignment of the accounts protected defendant. The president of the bankrupt had been too badly and too recently frightened to make it probable that he would take any more chances of going to jail. Under such circumstances, the greater the probability that the bankrupt would fail, the more reason would the defendant have to give such aid as would postpone bankruptcy until four months had elapsed from the date of the assignments now disputed.

It follows that it must be held that Mr. Duncan had reasonable cause to believe that a preference would be brought about by the assignment which he demanded and received.

## Was the Bankrupt Insolvent When the Assignment was Made?

[4, 5] The common-law test of insolvency has the merit of simplicity and comparative certainty. It is usually possible to find out whether, on any particular day, the alleged bankrupt was able to pay his debts then due, in lawful money; but in panic times, and during the earlier portions of the periods of depression which follow, an enormous majority of merchants are always unable to do so. Congress felt that

a man ought not to be forced into bankruptcy if, at a fair valuation of his possessions, he has more than he owes. Just and reasonable as this standard is, it is difficult to apply in practice. What is a fair valuation of any man's property? It is easy to say that it is a price which a man who is willing but not forced to sell can get from some one who has use for the property, but who is under no compulsion to buy it. It often is very hard to find out what that price is. The wisdom of the congressional definition is however to be measured by the cases it keeps out of the bankruptcy court rather than by its workings in those which come in. It is quite possible that in the majority of the cases actually tried the application of the common-law test would serve justice better, for by the time most of them come before the court nothing can be done for the debtor, the only person Congress was anxious to protect. He is then broken in fact if not in law. The controversy is narrowed down to a fight among his creditors as to whether some one or more of them may retain property they obtained from him within the four months preceding the filing of the bankruptcy petition. Doubtless Congress was unwilling to complicate the working of the law by prescribing one test of solvency in one set of circumstances and a different one in another. Yet such a distinction would have much in its favor. The debtor's property may be worth as much or a little more than he owes, provided it can be sold in due course and for its reasonable value. It may be certain that if it be forced upon the market, and his estate be further burdened by the expenses of legal liquidation, his creditors will receive much less than the face of their claims. Such a man is, within the meaning of the bankrupt law, solvent, and may pay any of his creditors whom fear or favor make him anxious to satisfy. Nevertheless those who receive, and it may be extort, such payment, may feel sure that the debtor will not be able to go on and must very shortly go to the wall. They may know perfectly well that the very payments to them will precipitate the crash by depriving him of resources which, if wisely used, might postpone or perhaps prevent disaster. Such creditors seek preferences and get them in fact though not in law. Under such circumstances it is exceedingly difficult to apply the bankruptcy test of solvency to a debtor's condition on any particular day preceding the filing of the bankruptcy petition. The effort is to find out not what a real buyer and a real seller, under the conditions actually surrounding them, do, but what a purely imaginary buyer will pay a make-believe seller, under circumstances which do not exist. You are forced to wonder what would have happened if everything had been different from what it was. It is not easy to guess what will take place in Wonderland, as other people than Lewis Carroll's heroine have found out.

In the instant case, all the difficulty, and nearly all the controversy, is as to the true value of the bankrupt's assets on the 17th of February, when the assignment at issue was made. The defendant admits that the bankrupt then owed to unsecured creditors nearly $234,000. The trustee makes this total $236,500. They differ as to the sum of $2,600, which was, upon the bankrupt's books, then carried as a debt due to certain of its officers. The amount represented a dividend declared on its stock on the 1st of January, 1915, and which defendant truthfully

says was never earned. It will not be necessary to pass on the question thus raised. The bankrupt had something over $9,500 in bank. There was due it not quite $51,000, one-half of which was the estimated value at the time of a sum owed it by a single insolvent corporation, all of whose stock it owned. It had in San Francisco and other places certain samples, the cost price of which was $3,300. These valuations seem sufficiently high, but the parties have agreed to them.

The bankrupt owned certain machinery. The one witness who testified as to its value said it was worth $15,000. He seems to have known what he was talking about. The real estate, at the time the assignment of accounts was made, was mortgaged to the extent of some $62,000. It was subsequently further incumbered, and, by the time the trustee sold it, it was subject to liens, including taxes, interest, etc., aggregating $71,500. After repeated efforts to dispose of it at private sale, it was sold at public auction for $71,800. Had there been no testimony on the subject, I should see no special reason why it might not have been properly valued at what it brought. It is true it had to be sold without delay, but it was not recklessly forced upon the market. Time enough seems to have been taken to get out of it the most that anybody was willing to pay for it. Nevertheless, the trustee is doubtless bound by the value of $115,000 placed upon it by a witness he put on the stand. The opposing expert for the defendant says it was or should have been worth $138,265. I am satisfied both from the actual test of the market and the comparison of the two depositions themselves, as both experts were examined out of court, that the one who fixed the lower price valued the property at a sufficiently high figure. Upon that assumption the net value of the real estate on the 17th of February, over and above the mortgages then on it, was $53,000. At that time the bankrupts' total assets, exclusive of the stock of merchandise, did not amount to $132,000, as against an admitted indebtedness of $234,000. On this part of the case the only serious controversy possible is as to the worth of the merchandise the bankrupt then had. If that equalled or exceeded $102,000, the bankrupt must upon this record be adjudged as then solvent; otherwise not. The defendant says its value was about $146,000. The trustee says it was at the most only $81,000. There are two inventories in evidence, one taken by the bankrupt at the end of December, 1914, the other by the receiver five months later. If either was correct, and if the bankrupt's books were accurately kept, both sides agree that it would be possible to find out with approximate accuracy how much merchandise the bankrupt had on the 17th of February. There is no difference between them as to the proper method of making the calculation, but each denies the correctness of the inventory upon which the other relies, and both are forced to admit that the books were so untruthfully kept that any calculation based upon them leads to absurd conclusions. If the December inventory of the bankrupt be used as the basis of the calculation, the books purport to show that there was on hand in May goods worth from $100,000 to $200,000 which did not come into the receivers' hands. If from the receivers' inventory, through the use of the books the calculation be carried back, it will appear that the value of the bankrupt's merchandise on the pre-

ceding 31st of December was represented by a minus quantity. With such proof positive of the worthlessness of the books upon which each side relies, for calculating the value of the stock on the 17th of February, it is idle to waste time upon the results to which either of them come. If the books are obviously false, no greater reliance can be placed on the inventory, the sum of which purports to figure in the bankrupt's statement of December 31, 1914. It is true that the defendant has produced as a witness one who was, but is no longer, in the employ of the firm of accountants engaged by the creditors' committee to examine the bankrupt's books. He says that, from somewhat cursory examinations and tests of that inventory, he is inclined to believe that it is substantially accurate. It however appears from his and other testimony that the statement of which the inventory formed a part purported to show that on the 31st of December, 1914, the bankrupt's assets exceeded its liabilities by the comfortable margin of $328,000. In all probability the bankrupt was then already broken. If there was any margin to the good, it must have been of the smallest. The statement was false by at least $300,000. All sorts of devices were used to force such a showing. An inventory is the asset which usually is the easiest to inflate. When all else in the balance sheet was false, it is impossible to believe the inventory to have been true.

[6-8] The burden of proving insolvency in February is on the trustee. Has he sustained it? He has shown that in May the insolvency was hopeless and extreme. The estate seems to have been carefully and honestly administered. The creditors will not realize more than 12 cents on the dollar. If in February the bankrupt was solvent in any sense of the term, its condition in the next three months must have undergone a radical change for the worse. Of such a change there is no evidence. Conversion to their own use of bankrupt's money by those in charge of its affairs cannot be presumed merely from evidence that they were unscrupulous persons. It is highly probable that between February and May goods were sold at low prices. During the earlier part of that period the bankrupt's president must have felt himself under urgent pressure to make sales, for only by so doing could accounts be created to supply defendant's demand for assignments. There is no evidence, however, that such sales were in sufficient quantity or at sufficiently low prices to turn a concern which in February was solvent, even in the limited bankruptcy sense, into the sorry financial wreck it was in May. Both authority and common sense are at one in holding that such a showing sustains the burden resting upon the trustee.

It follows that there has been made out every element necessary to establish a preference voidable under the Bankrupt Act.

The Alleged Preference under the Corporation Law of New York.

[9] Section 66 of the Stock Corporation Law of New York provides, in effect, that no conveyance, assignment, or transfer of any property of a corporation which has refused to pay any of its notes or other obligations when due, in lawful money, nor any payment

made, judgment suffered, lien created or security given by it, when it is insolvent, or its insolvency is imminent, with intent to give a preference to any particular creditor over other creditors of the corporation, shall be valid. It is further provided that every person receiving, by means of any prohibited act or deed, any property of the corporation, shall be bound to account therefor to its creditors, stockholders, or other trustees, and it is declared that every transfer, assignment, or other act done in violation of the preceding provisions shall be void.

The Circuit Court of Appeals for the Second Circuit has held that a trustee in bankruptcy may recover property the transfer of which this state statute declared void. Grandison v. Robertson, 231 Fed. 785, 145 C. C. A. 605. In that case the trustee's authority was derived from section 67-e of the Bankruptcy Act (Comp. St. 1916, § 9651); but in Cardoso v. Brooklyn Trust Co., 228 Fed. 333, 142 C. C. A. 625, the conveyance set aside was made nine months before bankruptcy, and the trustee relied upon the provisions of section 70-e. Under the construction placed upon this state statute by the highest court of New York, its application is not limited to cases in which the corporation has refused to pay its notes or other obligations when due. It is declared that the enactment was intended to prevent unjust discrimination and preferences among creditors of insolvent corporations or those bordering on insolvency. Cole v. Millerton Iron Co., 133 N. Y. 164, 30 N. E. 847, 28 Am. St. Rep. 615; Caesar v. Bernard, 156 App. Div. 724, 141 N. Y. Supp. 659; Id., 209 N. Y. 570, 103 N. E. 1122.

[10-12] Within the meaning of the New York statute, insolvency is a general inability to answer in the course of business the liabilities existing and capable of being enforced. Brouwer v. Harbeck, 9 N. Y. 589. For its application it is not necessary that knowledge or notice of the insolvency shall have been brought home to the creditors receiving the preference. Brouwer v. Harbeck, supra. And it is, of course, immaterial, as it is under the Bankruptcy Act, that the defendant became a creditor of the bankrupt through the fraud of the latter's officers. Atkinson v. Rochester Printing Co., 114 N. Y. 168, 21 N. E. 178.

Defendant says that the assignments were valid, even if they were subject to the New York statute, because it claims there is no sufficient evidence that the bankrupt intended to prefer it; but it asserts that the New York statute is altogether out of the case, and that for two reasons: First, that it is applicable only when the debtor, being a New York corporation, the preferred creditor is either a citizen or body corporate of that state; and, second, that it renders invalid only such preferential assignments as are made within the territorial limits of the state of New York, as in defendant's view those in controversy were not.

### Did the Bankrupt Intend to Prefer the Defendant?

[13] The president of the bankrupt says that when he made the assignment he expected to pay everybody in full and go on in business.

It is hard to believe he had any such expectations. He certainly had no reasonable ground for them. A large part of his very considerable indebtedness for merchandise was overdue. That in itself might not have been presently serious. Others in like case had often triumphed over such a situation. He might well have thought that he could do so if he could keep control of his liquid assets, so that he could from time to time make some shift to pay something to such importunate creditors as could no longer be put off with fair words. But these transactions with the defendant made this practically impossible. He assigned and agreed to assign not only all the good accounts existing in February, but all others to be created in the next few weeks. He was far too shrewd not to foresee the almost if not quite inevitable result. The fact is that he realized the position in which his fraudulent conduct had placed him, and he expressly admits that he felt he must first take care of the defendant. To satisfy the latter, and thus prevent his own criminal prosecution, was his first concern. No serious weight can be now given to his statement that he did not anticipate what actually happened.

## Defendant Not a New York Corporation.

[14] Defendant says that the New York statute in question is not applicable, unless the preferred creditor is a resident, a citizen, or a corporation of that state. It cites cases which hold that states' insolvent laws do not release debts due citizens of other states. No state may impair the obligation of a contract. It may not therefore discharge any debts except those which within its territory, after the passage of the insolvent act, have been incurred to persons subject to its laws. As this constitutional prohibition has no bearing upon the statute now under consideration, the cases which apply it are not in point. It is possible to argue that, when Congress said that certain preferences could be set aside, it implied that all others should be valid. In view of the broad language of section 70 of the Bankruptcy Act, the federal courts have felt constrained to reject this contention. Grandison v. Robertson, supra.

## Is the New York Statute Applicable if the Assignment was Made Outside of That State?

Defendant says that an insolvent New York corporation, in spite of the statute, may make a valid preferential transfer, when such transfer is consummated outside of the territorial boundaries of the state. It relies upon Warren v. First National Bank, 149 Ill. 9, 38 N. E. 122, 25 L. R. A. 746. In that case a New York corporation operated a coal mine in Ohio. In the latter state it assigned to an Ohio bank a claim for coal there mined and sold to an Illinois corporation. The court held that the property transferred had been created in Ohio, and had been there parted with to one not subject to the New York law. It said that the charter alone is recognized and enforced in other jurisdictions, and not the general legislation of the state by which the company is created. For this conclusion it cited, among other authorities, Hoyt v. Sheldon, 3 Bosw. (N. Y.) 267. In

the last-mentioned case the transfer was made by an insolvent New Jersey corporation. It assigned a mortgage upon New York property, and the transfer was made in New York. The court there said that the purchaser was not bound to look beyond the charter of the company, or to inquire what were the general laws of New Jersey in regard to the powers and duties of their corporations.

Assuming, but not deciding, that the proposition laid down in Warren v. First National Bank and Hoyt v. Sheldon is sound, the question remains, "What is a charter?" Incorporation by special legislative act is now comparatively rare. In most, if not all, of the states the overwhelming majority of all incorporations are made under the provisions of the general statutes, and the charter or certificate of incorporation of a body corporate shows on its face that it is issued under and in pursuance of the corporation laws of the state granting it. Are not these laws thus made a part of the charter itself? Reference will serve all the purposes of quotation.

## Where Was the Assignment Made?

[15] But unless the preference was made outside of New York, it is not necessary to discuss whether the statute has or has not any extraterritorial effect. Defendant points out that, by the terms of the contract under which it had been buying bankrupt's accounts, the latter was required to tender to the defendant, at the latter's Baltimore office, the accounts it wished to sell. This tender was made by forwarding copies of such accounts to the defendant, and the latter at Baltimore decided which of them it would buy. From Baltimore it forwarded to the bankrupt the money for those it bought. The interview at which the defendant's president and the bankrupt agreed to assign sufficient number of accounts to make good the money of the defendant which the bankrupt had improperly converted took place at the bankrupt's office in New York. In pursuance of such agreement, the assignments of such accounts, made out by the bankrupt, were forwarded to Baltimore, and the defendant thereupon notified the bankrupt by mail that the assignments had been accepted. No money passed from the defendant to the bankrupt. Among the cases upon which defendant relies are those in which it has been held that, although sales of liquor were solicited by the seller in prohibition territory, the sales were finally consummated at the seller's place of business, at which such sales were legal. It also refers to cases in which insurance policies were held to be subject to the law of the state in which the insured lived, because in some instances the application provided that the policy should not become effective until the first premium was paid by the insured. The courts have ruled that under such a provision the contract was consummated at the place at which such payment was made. Other authorities have held that the requirements as to notice to policy holders found in the laws of a state under which the insurance company held its charter were intended for the protection of policy holders within that state and no others.

The case at bar, in its practical aspects, is unlike any of these. The thing which the state sought to prevent was not the making of a par-

ticular contract. It wished to forbid the attainment of a specific result; that is, a preferential transfer by a New York corporation in failing circumstances. The state cared nothing whether such transfer required the making of a contract or not. In the broadest definition of a contract one is ordinarily involved in the effecting of such a transfer; but it is not the contract, but the transfer, which is prohibited. It does not make any difference what form the transaction takes, if the transfer is effected thereby. Thus, when an insolvent New York corporation suffered a judgment to be given against it in Maine, it was held that the transaction came within the terms of the statute. Olney v. Baird, 7 App. Div. 95, 40 N. Y. Supp. 202.

When a New York Corporation, in New York, does a forbidden thing, it does something that is subject to the New York law. Some creditor outside of the state of New York may, after all, decide not to accept the transfer. He cannot by postponing, until his return from New York, his formal acceptance of the items which as an aggregate he had demanded in New York, make legal what would otherwise be illegal.

It follows that the trustee is entitled to recover as well under the New York statute as under the bankruptcy law.

[16] It is unnecessary to consider in detail some other contentions made by defendant. It calls attention to the fact that the original agreement for the purchase of accounts, under which the parties had for some years been operating, provided for the retention of approximately 20 per cent. of the purchase price of the accounts in defendant's hands until the assigned accounts were paid, and then said:

"No payments of any such remainder need be made so long as any accounts purchased hereunder are affected by any breach or violation of any warranty hereunder, but such remainder, and any moneys, accounts, or property of the bankrupt which may come into the possession of the defendant, may be held and later applied to the payment of any such accounts."

Under such provision defendant argues it makes no difference how or when the accounts in controversy came to be assigned to the defendant. If it once got them into its hands, it had a right to reimburse itself for the moneys previously improperly converted by the bankrupt. As against the bankrupt, so it would have, except for the provisions of the federal and state law prohibiting preferences. The parties could not contract themselves out of the operation of such statutes as to any property transferred to the defendant in a forbidden manner or for a prohibited purpose.

[17] Defendant's remaining contention is that the moneys wrongfully converted by the bankrupt enhanced the latter's estate. It says it is therefore entitled to be paid out of such estate to the extent of such enhancement. Quite true; but where is the evidence of any enhancement? All that came into the trustee's hands was $44,995.30, a large part of which was the proceeds of merchandise sold by the receiver or trustee. The bankrupt's stock was certainly no larger in May than it was in February. Defendant claims that there was a great many thousand dollars less of it. Four thousand four hundred dollars, or about one-tenth of the total receipts of the trustee, was the

proceeds of the machinery sold, which for the most part had been in the plant for years. And it is no more possible to trace any of the defendant's money into unassigned accounts collected by the bankrupt's receiver or trustee. It must be borne in mind that the trustee, upon the theory now under discussion, is liable only for such property as came into his hands and into which defendant's money can be traced, and of such there is none.

It follows that the defendant must be decreed to pay to the plaintiff the net sums received by it from the accounts in controversy in this case, from which, however, should be deducted a sum equivalent to the same dividend on the amount the bankrupt owes it as has been paid the other unsecured creditors.