320 F.3d 482
 In re REGIONAL BUILDING SYSTEMS, INCORPORATED, Debtor.
Bedford Construction Corporation, Creditor-Appellant,
v.
The Plan Committee of Regional Building Systems, Incorporated, Debtor-Appellee.
 No. 01-2319.
 United States Court of Appeals, Fourth Circuit.
 Argued September 23, 2002.
 Decided February 21, 2003.
 
 1
 ARGUED: William Harley Roth, Kelly & Roth, New York, NY, for Appellant. Irving Edward Walker, Saul Ewing, L.L.P., Baltimore, MD, for Appellee.
 
 
 2
 ON BRIEF: Linda V. Donhauser, E. Hutchinson Robbins, Jr., Matthew G. Summers, Miles & Stockbridge, P.C., Baltimore, MD, for Appellee.
 
 
 3
 Before MICHAEL and GREGORY, Circuit Judges, and Rebecca Beach SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 
 4
 Affirmed by published opinion. Judge SMITH wrote the opinion, in which Judge MICHAEL and Judge GREGORY joined.
 
 OPINION
 
 5
 REBECCA BEACH SMITH, District Judge.
 
 
 6
 Plaintiff Bedford Construction Corporation ("Bedford") appeals the district court's affirmance of the bankruptcy court's order denying Bedford delay damages and interest. We agree with the lower courts and, accordingly, affirm.
 
 I.
 
 7
 In December 1991, Regional Building Systems ("RBS"), a manufacturer of modular housing units, entered into a contract with Aspen Knolls Construction Corporation ("Aspen Knolls") to manufacture, deliver, and install 1000 housing units on Aspen Knolls' property in Staten Island, New York. In February 1992, RBS entered into a subcontract agreement with Bedford Construction Corporation ("Bedford"),[1] under which Bedford was responsible for transporting the modular units manufactured by RBS to the Aspen Knolls building site, and then erecting and completing the structures.[2]
 
 
 8
 In late 1992, Aspen Knolls experienced financial difficulties and defaulted on a number of payments to RBS. Without these payments, RBS experienced a severe cash flow problem and was unable to meet its contractual obligation to deliver the requisite number of housing units to Bedford. Consequently, RBS suspended its work under the subcontract. As a result, Bedford was forced to bear the expense of supporting idled labor and equipment that would otherwise have been devoted to productive work. In July 1993, Aspen Knolls ceased paying RBS altogether, forcing RBS to terminate the Aspen Knolls contract as well as the subcontract with Bedford.
 
 
 9
 On November 9, 1993, RBS filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The bankruptcy court established March 15, 1994, as the last day on which creditors could file proof of unsecured claims in RBS's chapter 11 case. Bedford filed no proof of claim; it was, however, listed in RBS' bankruptcy schedules as holding an unsecured, nonpriority claim in the amount of $614,203.46.
 
 
 10
 On May 20, 1997, the bankruptcy court entered an order confirming the Amended Chapter 11 Plan of Liquidation (the "Plan"), proposed jointly by RBS and the Plan Committee.[3] The Plan recognized a separate class of creditors, designated as Class IV, for those holding valid claims under Article 3A of the New York Lien Law.[4] Under the Plan, the approximately $5,000,000.00 which RBS recovered from Aspen Knolls was segregated from the other estate assets and held in trust for the lien law beneficiaries. According to the Plan, all Allowed New York Lienholder Claims were to be paid in full prior to any distribution of estate property to general unsecured creditors. The Plan defined an allowed claim as one that is "determined to be valid under Article 3A of the New York Lien Law and allowed pursuant to a Final Order of the Court." All claims were deemed to be automatically disputed, and the bankruptcy court was vested with the responsibility of determining the validity and allowance of such claims. After full payment to the trust beneficiaries, any remaining assets would revert to the general bankruptcy estate and be divided among other creditors.
 
 
 11
 In July 1997, Bedford filed an Article 3A claim in the amount of $1,448,226.49, plus applicable interest. On October 22, 1997, the Plan Committee filed its first objection to all claims against the estate. The Committee compared the claims to RBS's books and records and sought to reduce those that had insufficient or no documentation from which the Committee could ascertain the validity of the variance. The Committee determined, inter alia, that Bedford's claim for $1,448,226.49 was overstated and sought to reduce it to $614,203.46.
 
 
 12
 The bankruptcy court began the evidentiary hearing on the Bedford lienholder claim on July 27, 1998. In the midst of the trial, Bedford moved to compel payment of the portion of Bedford's Class IV claim that the Plan Committee agreed was valid. Bedford and the Plan Committee thereafter reached an agreement, under which Bedford was paid the undisputed portion of its claim, in the amount of $718,128.83. The trial proceeded on Bedford's claim for reimbursable expenses, additional damages, delay damages, and for interest. In an extensive opinion, the bankruptcy court determined that Bedford was only entitled to recover an additional $22,067.82 and denied recovery for delay damages and interest. The district court affirmed the bankruptcy court's decision. Bedford first appeals the holding that New York law does not permit a subcontractor to recover delay damages from a general contractor. Second, Bedford argues that it is owed prepetition interest on all unpaid invoices.
 
 II.
 
 13
 Factual findings below are reviewed by this court under the clearly erroneous standard while legal conclusions are reviewed by this court de novo. See In re Stanley, 66 F.3d 664, 667 (4th Cir.1995) ("In essence, we stand in the shoes of the district court, inasmuch as we may not, generally speaking, set aside a finding of the bankruptcy court unless it is clearly erroneous.") (citations omitted). A finding of fact is clearly erroneous only when "the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made." In re Morris Communications, N.C., Inc., 914 F.2d 458, 467 (4th Cir.1990).
 
 A.
 
 14
 At trial, Bedford sought to recover damages for labor and equipment that were idled when RBS, unable to provide Bedford with the requisite number of manufactured units, suspended its obligations under the subcontract. The bankruptcy court denied Bedford's claim for delay damages, holding that New York law prevents such a recovery when the contractor is not responsible for the delays. Bedford argues, as it did before the district court, that financial difficulty does not excuse performance under a contract and that delay damages are proper.
 
 
 15
 It is clear that to the extent Bedford seeks to hold RBS liable for delays caused by Aspen Knolls, its claim runs counter to established New York law. In Triangle Sheet Metal Works, Inc. v. James H. Merritt and Co., 79 N.Y.2d 801, 580 N.Y.S.2d 171, 588 N.E.2d 69 (1991), the New York Court of Appeals denied a subcontractor recovery for delay damages, after finding that the delay was not the fault of the general contractor. Triangle, a subcontractor on a construction project for New York City, sought recovery against Merritt, the prime contractor, for performance delays which were contributed to by the City, other contractors, and weather delays. The trial court dismissed the claim and the appeals court affirmed, holding that:
 
 
 16
 This case falls squarely within the general rule that, absent a contractual commitment to the contrary, a prime contractor is not responsible for delays that its subcontractor may incur unless those delays are caused by some agency or circumstance under the prime contractor's direction or control. Contrary to Triangle's contention, there is no basis for concluding that a prime contractor — which oftentimes lacks control over much of the work to be performed at a particular project — has implicitly agreed to assume responsibility for all delays that a subcontractor might experience — no matter what their cause.
 
 
 17
 Id. at 802, 580 N.Y.S.2d 171, 588 N.E.2d 69 (citations and quotations omitted) (emphasis added). See also Norcross v. Wills, 198 N.Y. 336, 91 N.E. 803, 805 (1910) (holding that a party to a construction contract will be "answerable for all losses caused by delays, which his control of the work should make him responsible for..."). The Triangle court concluded that a subcontractor unhappy with this rule "should bargain for the inclusion in its subcontract of a provision" to the contrary. Id. at 803, 580 N.Y.S.2d 171, 588 N.E.2d 69. There was no such warranty in the instant case.[5]
 
 
 18
 Bedford does not dispute the holding of Triangle, but instead disputes its application to the current case. Bedford argues that nonpayment by the owner does not fall within the Triangle holding because Triangle does not alter the general rule that financial difficulty, even bankruptcy or insolvency, will not excuse performance of a contract. Despite Bedford's arguments to the contrary, Triangle is directly on point.[6] See Port Chester Electrical Construction Corp. v. HBE Corp., 978 F.2d 820, 822 (2nd Cir.1992) (applying Triangle to a dispute between a contractor subcontractor). Thus, we must turn to the question whether the delays suffered by Bedford were attributable, in whole or in part, to Aspen Knolls.
 
 
 19
 In its opinion, the bankruptcy court made specific and detailed factual findings regarding the cause of the project delays, concluding that Aspen Knolls' breach of its payment obligations to RBS was the cause of RBS's suspension of work. The court found that RBS acted reasonably, suspending deliveries only after Aspen Knolls had defaulted on several payments and resuming them once payments were again made. RBS terminated the contract only after Aspen Knolls had defaulted on two invoices totaling over $3,000,000.00, which the court determined so severely hampered RBS's cash flow that RBS was justified in suspending work. During this time, RBS kept Bedford fully informed about Aspen Knolls' financial troubles, knowing that Bedford also had direct contracts with Aspen Knolls. Finally, the bankruptcy court specifically rejected Bedford's contention that RBS was undercapitalized and thus was the real party who caused the delays. This determination, that Aspen Knolls was wholly responsible for the delays, cannot be overturned unless clearly erroneous. In this case, the bankruptcy court's findings of fact are fully supported by the record and consequently are not clearly erroneous.
 
 
 20
 Having determined that the delay was caused by Aspen Knolls' failure to pay RBS, not by any wrongdoing of RBS, the bankruptcy court concluded that under Triangle, RBS was not liable to Bedford for delay damages. This is the correct result. Triangle recognizes a specific rule, applicable to construction cases in general, and subcontracts, in particular. In the instant case, the bankruptcy court found that Aspen Knolls' default resulted in RBS's inability to meet its contractual obligations to Bedford under the subcontract. Under New York law, as set forth in Triangle, Bedford cannot claim delay damages for circumstances beyond RBS's control. Accordingly, we affirm the denial of delay damages to Bedford.
 
 B.
 
 21
 Bedford contends that it is entitled to interest on its claim.[7] The bankruptcy court held, and the parties agree, that claims for interest may not be paid out of Article 3A trust assets. In order to receive an interest payment, Bedford would have to collect from the general bankruptcy estate as an unsecured creditor. In order for an unsecured claim to be paid, it must be either filed as a proof of claim or be listed on the bankruptcy schedule. Bedford did not file a timely proof of claim. It was, however, listed on the bankruptcy schedule as being owed $614,203.46.[8] Bedford contends it is entitled to collect a portion of this scheduled amount to pay its claim for interest.[9] The bankruptcy court disagreed, determining that the payment of the New York lienholder claim, in the amount of $718,203.46, fully satisfied any claim that RBS had scheduled as owed to Bedford. Bedford, therefore, was not entitled to collect on its claim for interest from the general bankruptcy estate. Bedford appeals this ruling as contrary to bankruptcy law.
 
 
 22
 A creditor cannot claim more than the total amount scheduled. See, e.g., Pyramid Investments Co. v. Palmquist, 553 F.2d 1194, 1198 (9th Cir.1977). In this case, Bedford asserted that it was owed approximately $1,500,000.00 under the New York Lien Law. RBS's books indicated that Bedford was owed only $614,203.46. Both of these amounts are based on the same underlying project — Bedford's work for RBS on the Aspen Knolls project. They merely represent the differing positions of the parties as to what was truly owed. Thus, the payment of $718,128.83 to Bedford under the New York Lien Law fully satisfied the scheduled amount.
 
 
 23
 Bedford argues that because the New York Lienholder Trust was not technically part of the bankruptcy estate, then Bedford had the right to both the $1,400,000.00 and the $614,203.46 scheduled. It is true that the trust assets are not property of the bankruptcy estate and are subject to division outside the distribution scheme found in bankruptcy law. See Scherling v. Hellman Electric Corp. (In re Westchester Structures, Inc.), 181 B.R. 730 (Bkrtcy.S.D.N.Y. 1995). This distinction, however, is designed merely to ensure that the beneficiaries of the trust take complete priority in payment as against other creditors. It is not to be abused by a creditor seeking to recover twice for the same losses arising out of the same debt. Bedford is not entitled to collect from non-trust assets once payments on its claims from the trust assets exceeded the amount the debtor scheduled as owed to Bedford. In this case, because Bedford did not file a proof of claim in the amount of the interest and because the unsecured claims have been satisfied, Bedford cannot recover the claim for interest from the bankruptcy estate.
 
 
 24
 One of the cardinal principles of bankruptcy law is equality among types of creditors. See 11 U.S.C. § 1122(a). Once a creditor receives from the trust assets more than the debtor scheduled as owing to it, the creditor cannot then assert a claim against non-trust assets. Bedford received more than was listed on RBS's schedule. It has no right to collect on that debt again simply because the New York Lien Law did not provide for interest out of the trust assets. To hold otherwise would be to permit a creditor to obtain an undeserved windfall by recovering for the same debt twice — first from a non-estate trust asset and then again from the estate for a scheduled claim.
 
 Accordingly, the judgment is
 
 25
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 The subcontract provided that its terms were to be interpreted in accordance with New York law
 
 
 [2]
 Bedford also performed work for RBS outside the subcontract, which included routine carpentry adjustments and repairs to the modular units. The work was separately invoiced to RBS as "reimbursable expenses."
 In addition, Bedford did other work for Aspen Knolls directly, for which RBS was not responsible, including a contract entered into in November 1992, requiring Bedford to perform finishing work on the modular units. There were other contracts between Bedford and Aspen Knolls for site clearing and drainage work, general excavation, and sanitary and storm sewers.
 
 
 [3]
 The Plan vested the Plan Committee with all duties, powers and responsibilities of a trustee appointed pursuant to 11 U.S.C. § 1104. The Plan Committee was also charged with objecting to any disputed claims in the debtor's case and making sure the monies of the bankruptcy estate were distributed in accordance with the provisions of the Plan and bankruptcy law
 
 
 [4]
 N.Y. Lien Law §§ 70-79a (McKinney, 1993). Article 3A protects those whose skills, labor and materials make improvements to real property, thereby giving rise to the owner's obligation to payFrontier Excavating, Inc. v. Sovereign Const. Co., 30 A.D.2d 487, 489, 294 N.Y.S.2d 994, 997 (1968). Although labeled by the Plan as "lienholder" claims, the New York Lienholder claims are actually statutory trust claims.
 
 
 [5]
 Bedford argues that the inclusion of theforce majeure clause was actually an attempt to contract out of the Triangle rule. It further contends that the force majeure clause did not explicitly excuse RBS from its delivery obligations due to financial distress. We find these arguments to be unpersuasive. The force majeure clause provides that RBS was entitled to suspend performance due to "inability to obtain labor and/or materials beyond the control of the Contractor." In this case, RBS was incapable of obtaining labor and materials because Aspen Knolls defaulted on payments. This seems to us to fall within the language of the force majeure clause.
 
 
 [6]
 The cases cited by Bedford for this proposition do not involve the relationship between a subcontractor and a general contractor, nor do they deal with the specific issue of delay damages. They instead articulate general principles of contract law which are inapposite to the issue of delay damages. Additionally, not one of the cases questions or over, rulesTriangle.
 
 
 [7]
 New York law provides for the recovery of interest in a breach of contract case. N.Y. C.P.L.R. §§ 5001 (Consol.2002)
 
 
 [8]
 After termination of the subcontract, RBS's books and records reflected amounts due to Bedford in the amount of $614,203.46. Although the schedules did not specify for what Bedford's unsecured claim was, RBS derived the amount of the claim by examining various invoices which did not include interest
 
 
 [9]
 Bedford does not argue that there are unsatisfied debts arising out of the Aspen Knolls contract which should be paid. Nor does it dispute that the payment under the New York lienholder trust was for the same debts on the bankruptcy schedule